**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                    )
                                    )
MICHAEL RAE,                        )
                                    )
                 Plaintiff,         )
                                    )
v.                                  )        Civil Action
                                    )        No. 19-11044-PBS
COMMONWEALTH OF MASSACHUSETTS       )
MASSACHUSETTS BAY TRANSPORTATION    )
AUTHORITY, KENNETH GREEN, individually, )
and RICHARD SULLIVAN, individually, )
                                    )
                 Defendants.        )
_____)
```

MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

April 22, 2021

Saris, D.J.

INTRODUCTION

Lieutenant Michael Rae ("Lt. Rae") sues his former employer, the Massachusetts Bay Transportation Authority ("MBTA"), and its employees Kenneth Green ("Chief Green"), Chief of the MBTA Transit Police Department, and Richard Sullivan ("Supt. Sullivan"), Superintendent of the MBTA Transit Police Department, alleging that his termination for sleeping on the job during multiple night shifts was racially motivated and violates his First Amendment rights and state law. He asserts the following claims: (1) the

1

MBTA and Chief Green discriminated against him because of his race (white) in violation of Mass. Gen. Laws ch. 151B (Count I); (2) the MBTA and Chief Green retaliated against him for filing an internal complaint of harassment against Chief Green in violation of Mass. Gen. Laws ch. 151B (Count III); (3) Chief Green and Supt. Sullivan retaliated against him because of his union affiliation in violation of the First Amendment and 42 U.S.C. § 1983 (Count V); (4) Supt. Sullivan interfered with his First Amendment rights by means of threats, intimidation, and/or coercion in violation of the Massachusetts Civil Rights Act (the "MCRA"), Mass. Gen. Laws ch. 12, § 11H (Count VI); (5) Chief Green and Supt. Sullivan intentionally interfered with his contractual rights in violation of state common law (Count IV); and (6) the MBTA failed to pay him all the wages to which he was entitled in violation of the Massachusetts Wage Act, Mass. Gen. Laws. Ch. 149, § 148 (Count VII).[1]  Defendants move for summary judgment on all six claims. For the following reasons, the Court **ALLOWS** their motions.

### BACKGROUND

The facts, viewed in the light most favorable to Lt. Rae as the nonmoving party, are as follows.

---

[1] The parties previously stipulated to dismissal with prejudice of Count II, which asserted a claim of discrimination based on veteran status against the MBTA and Chief Green.  See Dkt. 29.

I.   **Initial Investigation**

Effective March 5, 2016, the MBTA Transit Police Department (the "Department") assigned Lt. Rae, who is white, to work the 11:30 p.m. to 7:30 a.m. shift, known throughout the Department as the "last half shift."  Depending on the day, Lt. Rae would serve either as the "Duty Supervisor" or a "Road Lieutenant" on the last half duty shift.  The Duty Supervisor is the highest-ranking officer on duty during last half shifts.  He or she works from the "Duty Supervisor's Desk" – a desk located on an elevated platform within the dispatch area from which one can see the entire facility – and is responsible for supervising the operations of the Department throughout the entire MBTA system.  The Road Lieutenant is the highest-ranking officer on the road during last half shifts and is responsible for monitoring and supervising the work of the patrol officers, monitoring MBTA property, and responding to emergencies and other calls for service.

At 1:50 a.m. on Sunday, September 25, 2016, during a last half shift for which Lt. Rae served as Duty Supervisor, a call came in that a 13-year-old boy had been found asleep on a Silver Line bus at the Southampton Garage.  Officer Bartlett responded to the call.  Although standard procedure for the protection of juveniles is to query the Criminal Justice Information System to determine whether the child has been reported as missing, assess whether the child needs medical or other services, contact the

Department of Children and Families, determine the child's residential address, and release the child only to a parent or guardian, Officer Bartlett merely asked the boy for "his name, [date of birth], and . . . home address" and "transported" the boy to the apartment building he gave as his address without contacting a parent or guardian. Dkt. 44-3 at 3.

The next day, while reviewing the events of the weekend, Deputy Chief Preston Horton ("D.C. Horton") and Supt. Sullivan independently became aware of the call. Concerned, Supt. Sullivan emailed Lt. Rae and Sergeant Carrasco, the Patrol Supervisor, stating, "one is left to assume a thirteen-year-old is found sleeping on a bus at 2AM and NO additional steps were undertaken to determine how that came to be, the juvenile's physical/mental state of being, who received the child upon transport to his residence etc." Dkt. 42-2 at 2 (emphasis in original). He instructed them to "[a]scertain as much information as possible and adjust this report immediately." Id. D.C. Horton separately emailed Sergeant Carrasco to determine if Officer Bartlett had taken the requisite steps despite failing to include them in his report. **[Dkt. 40 ¶ 21]** Sergeant Carrasco confirmed that Officer Bartlett had not followed appropriate protocol.

Because he considered the mishandling of this event to be very serious – the child had been reported missing on September 21, 2016 and was not located again until September 29, 2016 – Supt.

Sullivan asked Deputy Chief Sean Reynolds ("D.C. Reynolds") to investigate how the incident had occurred.   D.C. Reynolds sent notices of investigation and a set of written questions to several officers whom he believed had knowledge of the situation, including Lt. Rae.[2]

In his answers to D.C. Reynolds's written questions, Lt. Rae stated that he was "unaware" of the call and referred to Officer Bartlett's report for any details regarding its handling.   Dkt. 43-2 at 3.  His responses surprised D.C. Reynolds because Lt. Rae, as the Duty Supervisor for the relevant shift, "should have been aware of this call for service" in real time.   Dkt. 43 ¶ 14. Suspecting that Lt. Rae was not at the Duty Supervisor's Desk when the call came in, D.C. Reynolds reviewed the video records of a camera (referred to as the "mantrap video") positioned to capture all entries and exits from the dispatch area to determine his whereabouts.   These records showed Lt. Rae leaving the dispatch area in a hooded sweatshirt at 1:46 a.m. during the September 24-25, 2016 last half shift and not returning until 6:04 a.m.  Because "Duty Supervisors are expected to work at the Duty Supervisor's Desk" unless they responding to a call for service, D.C. Reynolds

---

[2]  These other officers cooperated in the investigation and received discipline ranging from a written reprimand to a one-day suspension.

found Lt. Rae's four-hour absence "both inexplicable and very concerning."  Dkt. 43 ¶ 20.

Per standard operating procedure, D.C. Reynolds broadened the scope of his investigation to determine if the unexplained absence constituted a single instance of misconduct or was part of a larger pattern of wrongdoing.  He reviewed the mantrap video for the two last half shifts Lt. Rae worked before the September 24-25 shift and the two last half shifts he worked after it.  During all four of these shifts, Lt. Rae disappeared for prolonged periods (between 1 hour and 43 minutes and 4 hours and 39 minutes) without explanation.

## II. **Expanded Investigation**

D.C. Reynolds reported his findings to Supt. Sullivan, who authorized D.C. Reynolds to conduct an expanded investigation into misconduct.

On October 17, 2016, during fire alarm testing, D.C. Reynolds discovered that the "Night Lieutenant's Office," a room available for night lieutenants to use in situations requiring more privacy than the dispatch area can provide (e.g., when a citizen comes in to make a complaint), was locked.  D.C. Reynolds tried using the master key to access the room, but it did not work.  When he asked the building manager for a copy of the key to this room, the building manager informed him that Lt. Rae had taken the key and

had never returned it.  D.C. Reynolds accordingly arranged for a locksmith to change the lock.

After the locksmith opened the door, D.C. Reynolds, now joined by D.C. Horton and Supt. Sullivan, entered the office.  The three observed a "cot set up in the room with a sleeping bag and pillow"; "a heater . . . set up on the desk next to the cot"; "a duffle bag and a blanket"; a computer; and a filing cabinet labeled "Superior Officers Association."  Dkt. 43 ¶¶ 27, 28.  They also found a deadbolt on the only door providing access to the room.  Lt. Rae later admitted to installing the deadbolt without permission.

Lt. Rae discovered he could no longer access the Night Lieutenant's Office later that night.  He immediately emailed D.C. Reynolds asking to be "inform[ed] . . . of the change" and for "access to the office."  Dkt. 43-6 at 2.  When he later received permission from D.C. Reynolds to retrieve his personal property, the sleeping materials were among the items he removed.  D.C. Reynolds accordingly concluded that Lt. Rae had been using the Night Lieutenant's Office as a makeshift sleeping quarters during the hours in which he was missing in his last half shifts.

D.C. Reynolds pulled the available mantrap video records, which went back 90 days, to determine how often Lt. Rae was absent from dispatch while serving as Duty Supervisor or not on the road while serving as Road Lieutenant.  He also interviewed several officers and lieutenants about their experiences on the last half

7

shift.  The officers confirmed that Lt. Rae would often be "absent from dispatch for long periods of time and that this was not true of other Duty Supervisors for whom they worked."  Dkt. 43 ¶ 45. The lieutenants confirmed that "they worked their shifts from the Duty Supervisor's Desk except when their duties required that they be elsewhere," i.e., that they did not perform their duties out of the Night Lieutenant's Office.  Dkt. 43 ¶ 46.

Although the Department did not authorize lieutenants to perform their duties from the Night Lieutenant's Office, D.C. Reynolds nonetheless sought to verify whether Lt. Rae was performing his duties while absent.  In that vein, he cross-referenced audio recordings (which allowed him to see if Lt. Rae spoke on the radio or answered the Duty Supervisor's recorded line in dispatch); access card reports (which allowed him to see if Lt. Rae tapped into any work-related area); computer logs (which allowed him to see if, when, and from which computer Lt. Rae was logged in, including the computer in the Night Lieutenant's Office); and the dispatch system (which allowed him to see if Lt. Rae responded to or backed up any officer on call).  Based on the information he gathered, D.C. Reynolds "concluded that Lt. Rae was absent from the Duty Supervisor's Desk when he was the assigned Duty Supervisor and absent from his responsibilities on the road as Road Lieutenant for an aggregate of 176 hours, 9 minutes during the period July 19, 2016 – October 24, 2016 and that he was not

performing his duties during those missing hours" but was instead sleeping while on duty. Dkt. 43 ¶ 48. He also determined that Lt. Rae had violated the uniform requirements of the Department during at least 19 shifts and had failed to comply with a policy mandating disclosure to Professional Standards on at least 36 occasions in which he used the Emergency Access Card.

### III. **Disciplinary Hearing and Termination**

Chief Green, who is black, placed Lt. Rae on administrative paid leave ("APL") on November 10, 2016. Two and a half months later, after reviewing the results of D.C. Reynolds's investigation, Chief Green notified Lt. Rae that the MBTA would conduct a Disciplinary Hearing on charges including Dereliction of Duty, Sleeping While on Duty, Failure to Supervise, and Abuse of Position. The Disciplinary Hearing occurred on February 2, 2017 and March 1, 2017. After listening to the parties' arguments and reviewing their evidence, the Hearing Officer, who is white, concluded that just cause existed as to "all of the charges" asserted against Lt. Rae. Dkt. 41-4 at 15; see also id. at 11-15.

Chief Green, in consultation with Supt. Sullivan, D.C. Reynolds, and D.C. Horton, terminated Lt. Rae's employment effective March 28, 2017. Supt. Sullivan, D.C. Reynolds, and D.C. Horton are white.

IV.  **Arbitration**

The MBTA Police Superior Officers Association (the "Superior Officers Union"), which represented Lt. Rae, demanded arbitration pursuant to the parties' Collective Bargaining Agreement. Arbitrator Mary Jeanne Tufano ("Arbitrator Tufano") was assigned to the case.  She conducted evidentiary hearings on October 19, 20, 23, 24, and 25, 2017.

During these hearings, Lt. Rae did not dispute that he had spent long periods of time in the Night Lieutenant's Office while serving as Duty Supervisor or Road Lieutenant.  He instead maintained that Department policy allowed him to perform his duties from "wherever the job took" him, including the Night Lieutenant's Office.  Dkt. 45-2 at 23.  The MBTA offered testimony from other lieutenants who had had worked the last half shift contradicting Lt. Rae's position.  The MBTA also offered the testimony of a patrol officer who had worked with four Duty Supervisors, including Lt. Rae, on the last half shift that Lt. Rae was the only one to leave the Duty Supervisor's Desk for extended periods of time.

Arbitrator Tufano issued her decision on February 8, 2018. She noted that the "gravamen" of the MBTA's complaint was "the 'unaccounted for' time that Lt. Rae spent away from the [D]uty [S]upervisor's [D]esk in the dispatch area, or not on the road when serving as road lieutenant."  Dkt. 45-3 at 37.  Because the evidence "establishe[d]" that Lt. Rae was not performing the duties

of these positions during these periods of unaccounted-for time, she determined that just cause existed for disciplining him.  Id. at 39.  And because she found "the dereliction of duty offense," if not the other conduct (e.g., failing to wear a uniform or failing to report use of the Emergency Access Card), to be a "serious offense meriting discharge," she sustained the penalty of termination.  Id. at 46-47.  In doing so, she rejected the Superior Officers Union's contention that the discharge was motivated by anti-union bias.

### V.   Union Activity

Lt. Rae first became a member of the Superior Officers Union when he was promoted to lieutenant in 2013.  In 2014, he was elected as the union's Vice President, and in 2015, he became its President.  In his role as President, he "routinely filed grievances . . . regarding the uniform allowance, union delegates, TPSA commander overtime, TPSA reorganization, accreditation, and" terminations.  Dkt. 45-3 at 9.

On June 28, 2016, the recently terminated Vice President of the Superior Officers Union, Lieutenant Christopher Maynard, publicly posted a picture of Supt. Sullivan sleeping during a break in an interest arbitration.  Later that day, Supt. Sullivan called Lieutenant Richard Salisbury, a member of the Executive Board of the Superior Officers Union, to complain.  During the call, Supt. Sullivan allegedly stated that the General Manager of the MBTA had

authorized him to hire a private detective to investigate the officers on the Executive Board at his own expense, and he threatened to spend up to $20,000 of his own money suing them for "defamation of character."  Dkt. 54-2 ¶ 4.  Supt. Sullivan also allegedly told a different union individual, Lieutenant Richard Campos, that he was going to "crush you guys."  Dkt. 45-3 at 10. Supt. Sullivan disputes making either statement.

The Superior Officers Union subsequently denounced Lt. Maynard's post and disclaimed having any role in it.

## VI.   Complaints Filed by Lt. Rae

On September 27, 2016, Lt. Rae filed a complaint with the Office of Diversity and Civil Rights, alleging that Sergeant Michael Flanagan, the president of the union representing police sergeants, had threatened to physically harm him during a union meeting.   After investigating the complaint, Supt. Sullivan concluded that the allegations were "not sustained."  Dkt. 42-4 at 12.

On November 10, 2016, after learning about his impending placement on APL, Lt. Rae filed another complaint with the Office of Diversity and Civil Rights, this time accusing Chief Green of intimidation and harassment.  Supt. Sullivan and D.C. Reynolds did not learn of Lt. Rae's complaint against Chief Green until several days after they placed Lt. Rae on APL.

## VII. **Chief Green Interview**

In April of 2016, a local radio station interviewed Chief Green about his vision for the Department.  During the interview, Chief Green discussed the preference given to veterans in hiring decisions.  He acknowledged that veterans are "deserv[ing] of having preference" but noted that "people in the community deserve new positions as well."  Dkt. 45-9 at 9.  He explained that he planned to navigate this "tricky situation" by making a more "concentrated effort to recruit minority veterans and minorities within the community."  Id.  He further expressed a desire to "darken" up the Department, which was then seventy-four percent white.  Id. at 17.

## DISCUSSION

## I.   **Legal Standard**

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if "the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." Id.

Generally, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990). Once it has made the requisite showing, the burden shifts to the nonmovant to "present definite, competent evidence to rebut the motion" and demonstrate that a "trialworthy issue persists." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (internal citations and quotations omitted). "'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000) (quoting Anderson, 477 U.S. at 252).

## II.   Racial Discrimination Claim (Count I)

In Count I, Lt. Rae claims that the MBTA and Chief Green terminated him because of his race (white) in violation of Mass. Gen. Laws ch. 151B. He argues that the April 2016 radio interview of Chief Green constitutes direct evidence of discrimination. The Court disagrees. During the interview, Chief Green discussed the need for increased diversity in the workforce and the effort to

recruit minorities.  He did not discuss any matter that would constitute direct evidence of a discriminatory motive involving Lt. Rae's termination, which occurred nearly a year later.  Cf. Patten v. Wal-Mart Stores E., Inc., 300 F.3d 21, 25 (1st Cir. 2002).  The claim itself thus must be assessed using the burden-shifting paradigm set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Under the McDonnell Douglas paradigm, a plaintiff bears the initial burden "to show by a preponderance of the evidence a prima facie case of discrimination." Blare v. Husky Injection Molding Sys. Boston, Inc., 646 N.E.2d 111, 115 (Mass. 1995).  If the plaintiff makes the requisite showing, the burden shifts to the employer to "rebut the presumption created by the prima facie case by articulating a legitimate, nondiscriminatory reason for its [employment] decision." Id.  If the defendant proffers a legitimate, nondiscriminatory reason for its action, "the burden of production shifts back to the plaintiff employee, requiring the employee to provide evidence that 'the employer's articulated justification is not true but a pretext.'" Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 33 (Mass. 2016) (cleaned up) (quoting Blare, 646 N.E.2d at 116).

Chief Green and the MBTA focus their arguments on the second and third stage of the McDonnell Douglas test, contending that they have met their burden to articulate a legitimate, non-

discriminatory reason for the termination – Lt. Rae's misconduct, as confirmed by D.C. Reynolds's investigation and the decision of the Hearing Officer – and that Lt. Rae has not provided evidence that this justification is a pretext.

Lt. Rae seeks to establish pretext in two ways.[3]  First, he argues that the extreme nature of the punishment – termination – indicates pretext.  It is true that, as he notes, Defendants have not offered any evidence that he had ever been subject to a prior disciplinary sanction.  But given the extent of the dereliction of duty (176 hours of sleeping on the job), no reasonable juror could find that the harshness of the punishment, standing alone, establishes pretext.  Nor has Lt. Rae offered evidence of differential treatment of similarly situated individuals which would support a reasonable inference that the severity of his punishment reflected untruthfulness.

Second, Lt. Rae relies on the contents of the April 2016 radio interview to demonstrate racial animus.  In the interview, Chief Green discussed his hope of "darken[ing]" the Department.  Dkt. 45-9 at 17.  He said that the Police Department was "too white."[4]

---

[3] Because he does not mention the alleged comments Chief Green made to Lt. Rae while Lt. Rae was a recruit at the police academy or after Lt. Rae arrested a young black woman who had littered at an MBTA station and refused to leave, he has waived any argument that these comments demonstrate pretext.

[4] He did not, however, make any derogatory or negative statements about white individuals.

<u>Id.</u>  He also relies on allegations that Chief Green, when he was a lieutenant, called another lieutenant (white) a racist. Plaintiff's counsel presses the Court to infer racial bias from these statements.  He maintains that, if Chief Green had discussed a desire to increase the representation of whites in the Department, his comments would likely be interpreted as racist. The Court does not find the argument reasonable.  Although Lt. Rae disagrees with the language used by Chief Green in the interview, even he acknowledges that "diversity in law-enforcement departments is a lofty, admirable and necessary goal." Dkt. 52 at 14.  In any event, it is undisputed that Lt. Rae was terminated after an extensive investigation into suspected misconduct.  Lt. Rae does not challenge the ultimate findings of this investigation (<u>e.g.,</u> that he slept on the job for 176 hours), which was conducted by white officers, and there is no evidence that Chief Green played any role in initiating or directing the scope of the investigation. Moreover, there is no evidence his decision was tainted by any alleged racial bias.  The Court accordingly **<u>ALLOWS</u>** the motion for summary judgment on Count I.

### III. <u>Retaliation Claim (Count III)</u>

In Count III, Lt. Rae asserts that the MBTA and Chief Green retaliated against him for filing a harassment and intimidation complaint against Chief Green on November 10, 2016, the same date he was put on paid administrative leave.  The court can discern

two alleged adverse actions from this claim: placement on APL and termination.   As to the first, the fact that Defendants indisputably did not become aware of the complaint until after they placed Lt. Rae on APL defeats any finding of causation.  As to the second, causation is again lacking because Lt. Rae offers no evidence to tie his termination to the act of filing of his complaint.   He relies solely on timing, but the investigation against Lt. Rae began several months <u>before</u> Lt. Rae filed the complaint, and a plaintiff cannot manufacture a claim of retaliation by filing a complaint after finding out he is under investigation.   The Court **<u>ALLOWS</u>** the motion for summary judgment on Count III.

### IV.   **First Amendment Claims (Count V)**

Lt. Rae asserts § 1983 claims against Chief Green and Supt. Sullivan for retaliation in violation of the First Amendment based on his union activities.  To make out a prima facie case of First Amendment retaliation, a plaintiff must show that "(1) he engaged in an activity protected by the First Amendment; (2) [the defendant] took an adverse action against him; and (3) there is a causal link between the protected activity and the adverse action." <u>Staples v. Gerry</u>, 923 F.3d 7, 15 (1st Cir. 2019) (citing <u>Hannon v. Beard</u>, 645 F.3d 45, 48 (1st Cir. 2011)).

Defendants do not dispute that Lt. Rae's participation in the Superior Officers Union qualifies as "activity protected by

the First Amendment." See id.  They dispute, however, whether Lt. Rae has tied his termination to any anti-union animus.

Lt. Rae fails to offer any evidence that Chief Green harbored anti-union animus, let alone that such animus was a substantial and motivating factor behind his termination.  He argues instead that Chief Green, by approving the termination, became "responsible for" the alleged anti-union animus of Supt. Sullivan, not that he had any anti-union animus himself.  He relies on a "cat's paw" theory of liability,[5] essentially arguing Chief Green was tainted by Sup. Sullivan's anti-union animus.  Dkt. 52 at 15.

The flaw in this theory is that Lt. Rae has not met his burden to establish a genuine dispute of material fact on the claim against Supt. Sullivan.  Lt. Rae, the union president and a union activist, has adduced some (disputed) evidence that Supt. Sullivan harbored anti-union animus:  The record indicates that Supt. Sullivan may have threatened to privately investigate and personally sue each member of the Union Executive Board using $20,000 of his own money and that he may have threatened to "crush" the union.  However, Lt. Rae offers nothing to link any alleged anti-union bias to his termination.  And in the absence of any

---

[5] "The 'cat's paw theory' is employed when one 'seeks to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.'" Ameen v. Amphenol Printed Cirs., Inc., 777 F.3d 63, 68 (1st Cir. 2015) (quoting Staub v. Proctor Hospital, 562 U.S. 411, 422 (2011)).

evidence of causation, the Court gives weight to Arbitrator Tufano's determination, amply supported by the record,[6] that the circumstances of the termination itself establish "that Lt. Rae was not discharged for his Union activity."  Dkt. 45-3 at 44; see Wojcik v. Massachusetts State Lottery Comm'n, 300 F.3d 92, 105 (1st Cir. 2002) ("Although the arbitrator's factual findings are not dispositive, they may be entitled to great weight." (citing McDonald v. City of W. Branch, 466 U.S. 284, 292 n.13 (1984))). The Court accordingly **ALLOWS** the motion for summary judgment on Count V.

### V.   MCRA Claim (Count VI)

In Count VI, Lt. Rae asserts that Supt. Sullivan interfered with his First Amendment rights by means of threats, intimidation, or coercion when he threatened to sue or "crush" members of the Executive Board.  Dkt. 45-3 at 10.  To bring a claim under the MCRA, Mass. Gen. Laws ch. 12, § 11H, a plaintiff must show "(1) his exercise or enjoyment of rights secured by the Constitution or

---

[6] For example, consistent with Arbitrator Tufano's findings, the record indicates that, despite making the alleged anti-union comments in June of 2016, Supt. Sullivan did not authorize any investigation against Lt. Rae until D.C. Reynolds independently discovered evidence of wrongdoing during an investigation into the mishandling of the September 25, 2016 incident.  Moreover, once he approved the expanded scope of the investigation, Supt. Sullivan did not play any active role in conducting it (aside from being physically present when D.C. Reynolds first entered the Night Lieutenant's Office).  Nothing in these facts suggest that Supt. Sullivan engaged in "untoward 'digging' to manufacture charges against Lt. Rae."  Dkt. 45-3 at 45.

laws of either the United States or the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." Meuser v. Fed. Express Corp., 564 F.3d 507, 516 (1st Cir. 2009) (internal quotation marks and citations omitted).

Here, Lt. Rae asserts that Supt. Sullivan's threats to Lt. Salisbury and Lt. Campos constituted an attempt to interfere with his right of association under the First Amendment.  However, he does not explain how the threats to "crush" the members of the Executive Board had any link to his termination or otherwise affected plaintiff's constitutional rights.  See Goddard v. Kelley, 629 F. Supp. 2d 115, 128 (D. Mass. 2009).  The Court accordingly **ALLOWS** the motion for summary judgment on Count VI.

## VI.   Intentional Interference Claims (Count IV)

In Count IV, Lt. Rae asserts that Chief Green and Supt. Sullivan intentionally interfered with his contractual relationship with the MBTA.  To establish intentional interference with a contractual relationship, Lt. Rae must prove that (1) "he had an advantageous relationship with" the MBTA; (2) Supt. Sullivan and Chief Green "knowingly induced a breaking of the relationship"; (3) Supt. Sullivan and Chief Green acted under an "improper" motive or means; and (4) their actions caused Lt. Rae harm.  See Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (quoting Blackstone v.

Cashman, 860 N.E.2d 7, 12–13 (Mass. 2007)).  Because Supt. Sullivan and Chief Green supervised Lt. Rae at the relevant time, Lt. Rae must further show that the "improper" motive or means underlying their actions encompassed actual malice.  See Pierce v. Cotuit Fire Dist., 741 F.3d 295, 304 (1st Cir. 2014) (citations omitted). Mere hostility is insufficient.  See id.

The only evidence of actual malice offered by Lt. Rae is the alleged anti-union animus of Supt. Sullivan.  But Lt. Rae has failed to causally link any anti-union animus to his termination (or even the underlying investigation precipitating his termination), as discussed in more detail above.  And without any basis for inferring the existence of a causal link between the two, no reasonable juror could find that Supt. Sullivan acted under an improper motive in recommending Lt. Rae for termination.  The Court accordingly **ALLOWS** the motion for summary judgment on the portion of Count IV asserted against Supt. Sullivan.

As for the portion of Count IV asserted against Chief Green, Lt. Rae does not appear to argue that it should survive the instant motion for summary judgment.  The Court accordingly **ALLOWS** the motion for summary judgment on this claim.

## VII. **Wage Violation Claim (Count VII)**

Count VII asserts a claim against the MBTA for unpaid wages for "days owed" and "comp time" under the Massachusetts Wage Act. The MBTA persuasively argues that the claim is precluded by § 301

of the Labor Management Relations Act, 29 U.S.C. § 185(a), because these issues are covered by the Collective Bargaining Agreement. Lt. Rae does not appear to rebut that "days owed" and "comp time" are creatures of the Collective Bargaining Agreement.

Moreover, the MBTA, as a branch of the Commonwealth of Massachusetts, is entitled to sovereign immunity. See Smith v. Massachusetts Bay Transp. Auth., 968 N.E.2d 884, 888 (Mass. 2012). Even if there is no preemption, Lt. Rae must show that the Commonwealth has waived sovereign immunity with respect to his Wage Act claim. By its express terms, the Wage Act applies to the Commonwealth only with respect to "mechanic[s], workm[e]n and laborer[s]" or employees of a "penal" institution. Mass. Gen. Laws ch. 149, § 148. Lt. Rae argues that "law enforcement officers such as an MBTA police officer" fall within the scope of this class of employees. The Massachusetts Appeals Court recently rejected a similar claim brought by court officers, at least in part on the ground they perform police duties. Donahue v. Trial Ct., 164 N.E.3d 925, 931-32 (Mass. App. Ct. 2021). The Court holds that the Wage Act does not waive the Commonwealth's sovereign immunity with respect to claims brought by MBTA law enforcement officers. The Court accordingly allows the motion for summary judgment on Lt. Rae's Wage Act claim.

## ORDER

For the reasons stated above, the motions for summary judgment (Dkts. 36 & 38) are **ALLOWED**.  The Clerk will enter judgment against Lt. Rae on Counts I, III, IV, V, VI, and VII and orders that the case be closed.

SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
United States District Judge